Filed 9/15/22

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE et al., | C093941 |
| Plaintiffs and Respondents, | (Super. Ct. No. 34-2019-80003109-CU-WM-GDS) |
| v. | |
| BOARD OF PAROLE HEARINGS, | |
| Defendant and Appellant; | |
| NATHAN JOSHUA RAMAZZINI, | |
| Real Party in Interest and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, James P. Arguelles, Judge. Reversed and remanded with directions.

Rob Bonta, Attorney General, Thomas S. Patterson, Senior Assistant Attorney General, Anthony R. Hakl, Supervising Deputy Attorney General, Nelson R. Richards and S. Clinton Woods, Deputy Attorneys General, for Defendant and Appellant.

USC Gould School of Law, Heidi L. Rummell and Michael J. Brennan; Buchalter and Steven G. Churchwell for Real Party in Interest and Appellant.

1

Human Rights Watch and Tracy J. Dressner in support of Real Party in Interest and Appellant.

Brendan Michael Farrell, District Attorney (Colusa County) and Matthew R. Beauchamp, Chief Deputy District Attorney (Colusa County) for Plaintiffs and Respondents.

In 1997, real party in interest and appellant Nathan Joshua Ramazzini was convicted of first degree murder with a special circumstance regarding a killing that occurred when Ramazzini was 16 years old. Pursuant to Penal Code section 190.5, subdivision (b), enacted by Proposition 115, the Crime Victims Justice Reform Act, Ramazzini was sentenced to life in prison without the possibility of parole (LWOP).[1] At the time Ramazzini was sentenced, courts interpreted section 190.5, subdivision (b) as establishing a presumption in favor of LWOP. (*People v. Guinn* (1994) 28 Cal.App.4th 1130, disapproved by *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*).)

In 2012, the high court concluded that the Eighth Amendment to the federal Constitution bars mandatory LWOP sentences for minors. (*Miller v. Alabama* (2012) 567 U.S. 460.) Our Supreme Court subsequently concluded that section 190.5, subdivision (b) confers discretion on the sentencing court to impose either a sentence of 25 years to life or LWOP, but the presumption in favor of LWOP as stated in *Guinn* was inconsistent with *Miller*. (*Gutierrez, supra*, 58 Cal.5th at pp. 1386-1387.)

In response to *Miller*, the California Legislature passed Senate Bill No. 394 (2017-2018 Reg. Sess.) (Senate Bill No. 394), which provided that those sentenced to LWOP for crimes committed when they were 16 or 17 years old are now eligible for release on parole during their 25th year of incarceration. (Stats. 2017, ch. 684, § 1.)

---

[1] Further undesignated statutory references are to the Penal Code.

Pursuant to Senate Bill No. 394, Ramazzini became eligible for a parole hearing in July 2021. Upon learning of Ramazzini's parole eligibility, the Colusa County District Attorney's Office (Office), on behalf of the People of the State of California, petitioned for writ of mandate in the trial court, seeking to invalidate Senate Bill No. 394 on its face and as applied to Ramazzini and to enjoin the Board of Parole Hearings (Board) from enforcing its provisions. The Office asserted that Senate Bill No. 394 violated article II, section 10, subdivision (c) of the California Constitution, which restricts the Legislature's ability to amend an initiative statute without the approval of the voters except where the initiative statute permits amendment without the voters' approval.

The trial court granted the Office's writ petition as applied to Ramazzini.

The Board appeals; it contends the Office lacked standing to petition for writ of mandate, and Senate Bill No. 394 was lawfully enacted because the Legislature may amend initiative statutes to address constitutional violations. Ramazzini also appeals; he joins the Board's contentions and separately contends that Senate Bill No. 394 was lawfully enacted because it does not amend Proposition 115's alternative sentencing scheme for 16- and 17-year-old defendants.

Disagreeing with the Board's argument regarding its standing to bring the writ petition, the Office argues that the Victims' Bill of Rights (Cal. Const., art. I, § 28) as well as various cases and statutes provide authority to bring the petition.[2] Accordingly, it argues principles of law and equity demand that its petition be permitted to proceed.

As we will explain, we agree with the Board that the Office lacks standing to petition for writ of mandate. Accordingly, we will reverse the judgment invalidating Senate Bill No. 394 as applied to Ramazzini and direct the trial court to dismiss the

---

[2] Further unspecified references to "articles" are to the California Constitution.

action.  Because the issue of standing is dispositive, we need not and do not address the other contentions raised on appeal.

## FACTS AND PROCEEDINGS

*Ramazzini's Conviction and Sentence*

In 1997, 16-year-old Ramazzini murdered Erik Ingebretsen; Ramazzini was tried in adult court and convicted of first degree murder with a special circumstance.  (§ 190.2, subd. (a)(15).)  The court sentenced Ramazzini to LWOP under Proposition 115, the Crime Victims Justice Reform Act, which was intended "to restore balance and fairness to [California's] criminal justice system."  (Ballot Pamp., Primary Elec. (June 5, 1990) text of Prop. 115, p. 33 (Prop. 115).)  Proposition 115 added section 190.5, subdivision (b), which provides that the penalty for special-circumstance murder committed by 16- and 17-year-old offenders "shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life."  At the time Ramazzini was sentenced, courts interpreted that provision as establishing a presumption in favor of LWOP.  (*People v. Guinn*, *supra*, 28 Cal.App.4th 1130.)

At Ramazzini's 1998 sentencing hearing, the prosecutor cited *Guinn* and argued that the presumption in favor of LWOP applied.  The sentencing court recognized the presumption and sentenced Ramazzini to LWOP, explaining that potential mitigating factors did not allow it to exercise its discretion to impose a sentence of 25 years to life.

*Subsequent Legal Developments*

In a series of cases starting in 2005, the United States Supreme Court held that unduly harsh sentences imposed on minors violate the Eighth Amendment's prohibition on cruel and unusual punishment.  (See *Roper v. Simmons* (2005) 543 U.S. 551, 569 [8th Amend. bars capital punishment for juveniles]; *Graham v. Florida* (2010) 560 U.S. 48, 82 [8th Amend. bars LWOP sentences for juveniles who commit nonhomicide offenses]; *Miller v. Alabama*, *supra*, 567 U.S. at p. 479 [8th Amend. bars mandatory LWOP sentences for juveniles].)

4

In 2012, the California Legislature passed a bill adding section 1170, subdivision (d)(2), which allowed certain juvenile offenders serving LWOP sentences to petition for resentencing. (Stats. 2012, ch. 828, § 1.) That same year, our Supreme Court held that sentencing a juvenile to 110 years in prison for a nonhomicide offense violated the Eighth Amendment. (*People v. Caballero* (2012) 55 Cal.4th 262, 267-268.)

In 2013, the Legislature added section 3051, which established a youth offender parole hearing procedure "for the purpose of reviewing the parole suitability of any prisoner who was under 18 years of age at the time of his or her controlling offense." (Former § 3051, subd. (a)(1); Stats. 2013, ch. 312, § 4.) As originally enacted, juveniles sentenced to LWOP were not eligible for youth offender parole hearings. (*Id.*, subd. (h).)

Our Supreme Court subsequently observed that section 190.5, subdivision (b) confers discretion on the sentencing court to impose a sentence of either LWOP or 25 years to life on a 16- or 17-year-old juvenile convicted of special circumstances murder, but *Guinn*'s presumption in favor of LWOP was inconsistent with the high court's decision in *Miller*. (*Gutierrez*, *supra*, 58 Cal.4th at pp. 1386-1387.)

In *Montgomery v. Louisiana* (2016) 577 U.S. 190, at page 212, the high court concluded that *Miller* was a new substantive rule that applies retroactively. The court advised that a state may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them. (*Ibid.*) In *Jones v. Mississippi* (2021) 141 S.Ct. 1307, at page 1320, the high court held that *Miller* and *Montgomery* did not require any additional specific procedures.

*Senate Bill No. 394*

The Legislature passed Senate Bill No. 394 (2017-2018 Reg. Sess.) in September 2017, which was approved by the Governor and filed by the Secretary of State in October 2017. (Stats. 2017, ch. 684, § 1.) The bill was intended to address the issue that offenders serving LWOP sentences committed before they turned 18 had no dedicated procedure to cure *Miller* violations and to "bring California into compliance with the

5

constitutional requirements of *Miller* and *Montgomery*." (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 394 (2017-2018 Reg. Sess.) Mar. 21, 2017, p. 4.) The law added section 3051, subdivision (b)(4), which makes those sentenced to LWOP before they turned 18 years old eligible for parole during their 25th year of incarceration. (Stats. 2017, ch. 684, § 1.)

Senate Bill No. 394 passed the Assembly with 44 "yes" votes, 30 "no" votes, and five non-votes in abstentia, a 55.6 percent majority, and the Senate with 28 "yes" votes, nine "no" votes, and three non-votes in abstentia, a 70 percent majority.

*The Office's Lawsuit*

In February 2018, the Ingebretsen family received a letter stating that, pursuant to Senate Bill No. 394, Ramazzini would be eligible for a youth offender parole hearing starting July 16, 2021. The family provided the letter to the Office, which filed a petition for writ of mandate in this court challenging the constitutionality of Senate Bill No. 394. This court denied the petition without prejudice to refiling in superior court.

The Office then filed the petition in Colusa County Superior Court, naming the Board as respondent and Ramazzini as a real party in interest. It observed that Proposition 115 provides in relevant part that the Legislature may not amend its provisions except by a two-thirds majority vote in the Legislature or by approval by the voters. (Prop. 115, § 30.) Recognizing that Senate Bill No. 394 did not pass with a two-thirds majority in both houses of the Legislature, the petition contended that Senate Bill No. 394 violates article II, section 10, subdivision (c), which provides in part that the "Legislature may amend . . . an initiative statute by another statute that becomes effective only when approved by the electors unless the initiative statute permits amendment . . . without the electors' approval." The Office recognized that its writ petition pursuant to article II, section 10 was the only mechanism through which it could obtain relief, and it further recognized that it was not seeking a writ as an alternative to an appeal because "there is no judgment to appeal."

6

The Board successfully moved to transfer the case to Sacramento County, and then demurred to the petition, arguing that the Office did not have authority to file the suit. In opposing the demurrer, the Office argued that the writ petition both related to and arose out of the criminal action, meaning the writ petition must be regarded as part of the criminal action, that it is authorized to participate in civil matters that are " 'in aid of or auxiliary to' " its usual duties, and that it sought a penal remedy, not a civil one. The Office also recognized that it is empowered to enforce the rights enumerated in article I, section 28, subdivision (b) "upon request of the victim," including the right to "prompt and final conclusion of the case and any related post-judgment proceedings." (*Id.*, subds. (b)(9), (c)(1).) Finally, the Office asserted that it had a recognized role in parole proceedings.

The trial court overruled the demurrer. The court observed that although the Board characterized the Office's petition as a combined facial and as-applied challenge to Senate Bill No. 394, the Office focused on the as-applied component of its petition. The court concluded the case "implicates enforceable rights enumerated" in article I, section 28, and the petition "arises directly from the underlying criminal case."

A different panel of this court denied the Board's petition for writ of mandate or prohibition seeking review of the trial court's ruling, and subsequently the Board and Ramazzini answered the petition.

The Board's opposition defended Senate Bill No. 394 on the merits; it argued that Senate Bill No. 394 cured an Eighth Amendment defect in Ramazzini's LWOP sentence, and article II, section 10, subdivision (c) does not bar the Legislature from amending initiatives to address constitutional violations. The Board also reiterated the argument made in its demurrer that the Office lacked authority to initiate a writ proceeding of a civil nature that names the Board and seeks to invalidate a duly enacted state law. Ramazzini joined the Board's opposition, and he separately argued that Senate Bill No. 394 did not amend section 190.5 because the bill did not *prohibit* an LWOP sentence.

7

While the matter was pending in the trial court, Ramazzini was separately pursuing a resentencing petition under section 1170, subdivision (d)(2). Another panel of this court recently issued a nonpublished opinion in that matter. (*People v. Ramazzini* (Oct. 5, 2021, C088503) [nonpub. opn.].) The panel concluded that Ramazzini's *Miller* claim was moot following the enactment of Senate Bill No. 394, but it conditionally vacated Ramazzini's sentence, and remanded with directions to conduct a juvenile transfer hearing pursuant to Proposition 57, the "Public Safety and Rehabilitation Act of 2016."[3] (*Ramazzini*, C088503.)

*Trial Court Order*

Before the hearing on the petition, the Office submitted a declaration from Devin Lombardi, Ingebretsen's sister and family spokesperson. She declared that the family "request[ed] that the Colusa County District Attorney's Office pursue the [case] on our behalf as victims, with our full support and permission, in order to restore the final conclusion of [the victim's] case." The trial court exercised its discretion to consider the declaration and requested a response from the Board. The Board challenged the declaration's relevance in part because the Office's petition did not seek to vindicate any right specified in article I, section 28, subdivision (b), but rather to challenge Senate Bill No. 394 on the basis that it violated article II, section 10, subdivision (c).

At the hearing on the petition, the Board argued that, although there were problems with the Office's representing Ingebretsen's family, substituting Lombardi for the People as the petitioner would eliminate the major issues with the Office's lack of authority to bring the case.

---

[3] The court's decision to conditionally vacate Ramazzini's sentence, but not his conviction, was consistent with the court's approach in *People v. Padilla* (2020) 50 Cal.App.5th 244, on which it relied. After *Ramazzini* was filed, our Supreme Court affirmed *Padilla*, although it clarified that the vacatur of the petitioner's sentence "made the judgment in his case nonfinal." (*People v. Padilla* (2022) 13 Cal.5th 152, 161, 170.)

8

The trial court granted in part and denied in part the writ petition. The court construed the Board's acknowledgement that substituting Lombardi for the People would eliminate the issues with the Office's authority to bring the case as a request to add Lombardi as a petitioner, and it added Lombardi as a petitioner without also removing the People.

The trial court ruled that article I, section 28 authorized the Office to represent the Ingebretsen family in challenging Senate Bill No. 394, but only in a challenge to the statute as applied to Ramazzini. On the merits, the trial court held Senate Bill No. 394 unconstitutional, rejecting the Board's argument that article II, section 10, subdivision (c) does not prohibit the Legislature from amending an initiative statute to cure the unconstitutional application of an initiative.

The Board and Ramazzini timely appealed from the trial court's order. The case was fully briefed in April 2022, and assigned to this panel on April 29, 2022. On May 4, 2022, Human Rights Watch filed an application to file an amicus brief in support of Ramazzini, and we granted that request. The Office filed a response to Human Rights Watch's amicus brief on May 24. Following oral argument on August 24, 2022, the case was submitted.

## DISCUSSION

### I

*The Office's Authority to Sue the Board*

The Board contends the Office lacks authority to sue the Board on behalf of the People; Ramazzini joins the Board's argument. In support of its contention, the Board argues the Office's petition should be interpreted as a civil action, and the Office can only act in the civil arena when specifically authorized to do so by statute or the Constitution. It further argues that no statute or constitutional provision authorizes the Office to petition for writ of mandate to challenge the validity of a statute. As we will explain, we agree with the Board that the Office lacked standing to petition for writ of mandate.

9

A. *Standard of Review*

The scope of the Office's authority to challenge Senate Bill No. 394 is one of law that we review de novo. (*Abbott Laboratories v. Superior Court* (2020) 9 Cal.5th 642, 651 (*Abbott Laboratories*).)

"Because the interpretation of constitutional provisions is a purely legal issue, our review is de novo, meaning we determine the provisions' meaning without deference to the judge's decision. [Citation.] [¶] Our task when interpreting constitutional provisions enacted by voter initiatives is to apply the provision's language to effectuate the electorate's intent. [Citation.] Because the language of the initiative itself is the most reliable indicator of intent, we start there, ' " ' "giving the words their ordinary meaning" ' " ' and construing them in the context of the initiative's ' " 'overall . . . scheme.' " ' [Citation.] If the words themselves are not ambiguous, the initiative's plain meaning governs. [Citation.] . . . ' "Where there is ambiguity in the language of the measure, '[b]allot summaries and arguments may be considered when determining the voters' intent and understanding of a ballot measure.' " ' " (*Slaieh v. Superior Court* (2022) 77 Cal.App.5th 266, 273.)

B. *The Office's Limited Standing to Bring Civil Actions*

The district attorney " 'is the public prosecutor, except as otherwise provided by law,' who 'shall attend the courts, and within his or her discretion shall initiate and conduct on behalf of the people all prosecutions for public offenses.' (Gov. Code, § 26500.) Moreover, 'all prosecutions shall be conducted in [the] name [of the People of California] and by their authority' (*id.*, § 100, subd. (b)), in other words by the designated executive branch officer." (*Steen v. Appellate Division of Superior Court* (2014) 59 Cal.4th 1045, 1053.) The district attorney has plenary authority to pursue actions in the criminal arena in the State's name. (*People v. Superior Court (Solus Industrial Innovations, LLC)* (2014) 224 Cal.App.4th 33, 41 (*Solus Industrial*).)

10

The duties of the district attorney can extend beyond those of a public prosecutor to the prosecution and defense of civil causes of action. (*Rauber v. Herman* (1991) 229 Cal.App.3d 942, 947 (*Rauber*); *County of Sutter v. Board of Administration* (1989) 215 Cal.App.3d 1288, 1293.) However, aside from specific exceptions we will discuss *post*, our Supreme Court held long ago that district attorneys may only prosecute and defend civil actions when specifically authorized by the Constitution or by statute. (*Safer v. Superior Court* (1975) 15 Cal.3d 230, 239 & fn. 13 (*Safer*); *Pacific Gas & Electric Co. v. County of Stanislaus* (1997) 16 Cal.4th 1143, 1155-1156 [citing *Safer* to explain that if a specific provision of the Cartwright Act authorizing the district attorney to bring antitrust actions on behalf of the county or its subdivisions did not exist, the district attorney would be unable to do so]; *People v. Superior Court (Humberto S.)* (2008) 43 Cal.4th 737, 753 & fn. 12; *Solus Industrial*, *supra*, 224 Cal.App.4th at p. 41 ["a district attorney's power to bring civil actions is limited to situations where such action is expressly authorized"]; *In re Dennis H.* (2001) 88 Cal.App.4th 94, 100-101; *In re Marriage of Brown* (1987) 189 Cal.App.3d 491, 495.) *Safer* set forth "illustrative statutes which specifically empower a district attorney to bring a civil action; thus he may: defend suits brought against the county and bring actions to collect fines and recognizances (Gov. Code, § 26521); test the validity of laws providing for the payment of county funds and recover any funds illegally paid out (Gov. Code, §§ 26523, 26525); represent judges appearing in their official capacities as parties defendant (Gov. Code, § 26524); sue to abate public nuisances in the name of the People (Gov. Code, § 26528); bring proceedings for the commitment and treatment of incompetent or disturbed persons (Welf. & Inst. Code, § 5114); prosecute parents for disobedience of a child support order (Welf. & Inst. Code, § 11484); bring an action for the declaration of parental relationship (Civ. Code, § 231); and enforce certain business regulation laws (Bus. & Prof. Code, § 16754)." (*Safer*, at p. 236.) *Safer* "makes clear that the Legislature's traditional practice has been to affirmatively specify the circumstances in which a district attorney

11

can pursue claims in the civil arena, not the circumstances in which he cannot." (*Solus Industrial*, at p. 42, citing *Safer*, at p. 236.) When given the opportunity to do so, our Supreme Court has declined to conclude that this interpretation of *Safer* was incorrect, stating: "Even assuming *Safer* established a general requirement that a district attorney may not pursue civil litigation without specific legislative authorization, that requirement is satisfied with regard to a district attorney's authority to bring a UCL action." (*Abbott Laboratories*, *supra*, 9 Cal.5th at p. 654.) In the absence of a Supreme Court opinion overruling or limiting its holding in *Safer*, we are bound to follow it. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

C. *Nature of the Instant Proceeding*

As we will explain, the writ proceeding here is a "special proceeding" that we treat as a civil action. "The Code of Civil Procedure classifies the remedies that may be obtained in the courts." (*People v. Superior Court (Laff)* (2001) 25 Cal.4th 703, 723.) "Judicial remedies" are defined as those remedies "administered by the courts of justice, or by judicial officers empowered for that purpose by the constitution and statutes of this state." (Code Civ. Proc., § 20.) Judicial remedies are divided into "actions" and "special proceedings." (*Id.*, § 21.)

"An action is an ordinary proceeding in a court of justice by which one party prosecutes another for the declaration, enforcement, or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense." (Code Civ. Proc., § 22.) Actions are classified as either civil or criminal. (*Id.*, § 24.) "A civil action is prosecuted by one party against another for the declaration, enforcement or protection of a right, or the redress or prevention of a wrong." (*Id.*, § 30.) A criminal action is "[t]he proceeding by which a party charged with a public offense is accused and brought to trial and punishment." (Pen. Code, § 683; see Code Civ. Proc., § 31 [definition of criminal action].) "A criminal action is prosecuted in the name of the people of the State of California, as a party, against the person charged with the offense." (Pen. Code, § 684.)

12

"Every other remedy is a special proceeding." (Code Civ. Proc., § 23.) "[A] special proceeding is confined to the type of case which was not, under the common law or equity practice, either an action at law or a suit in equity." (*Tide Water Associated Oil Company v. Superior Court* (1955) 43 Cal.2d 815, 822.) A petition is therefore a special proceeding that is not a definitively civil or criminal action. (*People v. Yartz* (2005) 37 Cal.4th 529, 536.)

Writs of mandate and prohibition are denominated special proceedings of a civil nature. (Code Civ. Proc., Part 3.) Writs of mandate compel the performance of a ministerial duty (*id*., § 1085), and writs of prohibition arrest proceedings conducted in excess of the presiding entity's jurisdiction (*id.*, § 1102). But although the petition for writ of mandate at issue here is of a civil nature, in writ proceedings courts will look to "the nature of the relief sought, not the label or procedural device by which the action is brought," to determine the parties' rights. (*In re Head* (1986) 42 Cal.3d 223, 226.) For example, in *Head*, inmates petitioned for a writ of habeas corpus and obtained a court order concluding that the procedures implementing a Department of Corrections work furlough program were constitutionally inadequate. The trial court awarded the inmates' counsel attorney fees, but the intermediate appellate court concluded that the section under which counsel sought fees only applied to civil cases. Reversing, our Supreme Court explained that vindicating constitutional rights was "not analogous to a defense against a criminal prosecution," and it concluded the inmates' claim was "of such a nature that it might have been presented in a purely civil proceeding -- by petition for writ of mandate or action for declaratory relief -- in which case no question would be raised as to the propriety of the [fee] award." (*Ibid*.)

Similarly, here, the Office's writ petition seeks to enforce or protect the voters' right to restrict the Legislature's ability to amend initiative statutes except in circumstances described by article II, section 10, subdivision (c). We agree with the Board that the relief sought by the Office is indistinguishable from that sought by a civil

13

complaint seeking to invalidate Senate Bill No. 394 and enjoin the Board from enforcing its terms. (*Greener v. Workers' Comp. Appeals Bd.* (1993) 6 Cal.4th 1028, 1045 ["a challenge to the validity of a statute prior to its actual application to the plaintiff seeks, in effect, declaratory relief"]; *Wenke v. Hitchcock* (1972) 6 Cal.3d 746, 751 [" 'Mandamus is . . . appropriate for challenging the constitutionality or validity of statutes' "].) Based on the civil nature of the relief sought by the Office's petition, we conclude that it is subject to the constraints described in *Safer* and its progeny. Indeed, certain passages of the Office's briefing suggest that it agrees with this characterization.

D. *Marsy's Law*

The Office argues that it possesses express constitutional authority to petition for writ of mandate via the Victims' Bill of Rights Act of 2008, also known as Marsy's Law, adopted by voter initiative Proposition 9 in 2008, which amended article I, section 28 and statutes. Marsy's Law was intended "to strengthen and increase the number of crime victims' rights." (*People v. Marquez* (2020) 56 Cal.App.5th 40, 47.) Marsy's Law "find[s] and declare[s]" that the rights of victims of crimes and their families include "personally held and enforceable rights described in . . . subdivision (b)" (art. I, § 28, subd. (a)(3)), which in turn sets forth 17 specific rights to which a crime victim shall be entitled (*People v. Hannon* (2016) 5 Cal.App.5th 94, 100; art. I, § 28, subd. (b)). These rights include, *inter alia*, the right "[t]o be heard, upon request, at any proceeding, . . . involving . . . post-conviction release . . . , or any proceeding in which a right of the victim is at issue" (art. I, § 28, subd. (b)(8)), "[t]o a speedy trial and a prompt and final conclusion of the case and any related post-judgment proceedings" (*id.*, subd. (b)(9)), and "[t]o be informed of all parole procedures, to participate in the parole process, . . . and to be notified, upon request, of the parole or other release of the offender" (*id.*, subd. (b)(15)). Marsy's Law further provides that a lawful representative of the victim or, upon the request of the victim, the prosecuting attorney, "may enforce the rights enumerated in

14

subdivision (b) in any trial or appellate court with jurisdiction over the case as a matter of right." (*Id.*, subd. (c)(1).)

The Office asserts that victims' right to a prompt and final conclusion of the case (art. I, § 28, subd. (b)(9)) authorizes Lombardi to petition for writ of mandate, and subdivision (c)(1) authorizes it to pursue the writ on her behalf. It argues that the right to "a prompt and final conclusion of the case" "means nothing if void unconstitutional laws are permitted to change special circumstance murder sentences, opening victims up to 'frequent and difficult parole hearings that threaten to release criminal offenders . . . prolong[ing] the suffering of crime victims for many years.' " (*Id.*, subds. (a)(6) & (b)(9).)

We disagree. Although "Marsy's Law established a victim's right to a 'prompt and final conclusion' to postjudgment proceedings," it "did not foreclose post-judgment proceedings altogether. On the contrary, it expressly contemplated the availability of such postjudgment proceedings, including in section 28, subdivision (b)(7) . . . , which affords victims a right to reasonable notice of 'parole [and] other post-conviction release proceedings,' and in subdivision (b)(8), which grants victims a right to be heard at 'post-conviction release decision[s] . . . .' " (*People v. Lamoureux* (2019) 42 Cal.App.5th 241, 264-265.) Thus, while Marsy's Law must be interpreted broadly, courts have "decline[d] to read it so broadly so as to restrict or eliminate altogether the Legislature's ability to create new postjudgment proceedings." (*People v. Marquez, supra,* 56 Cal.App.5th at p. 48 [collecting cases].) Indeed, " ' "[i]t would be anomalous and untenable for us to conclude, as [the Office] impliedly suggest[s], that the voters intended to categorically foreclose the creation of any new postjudgment proceedings not in existence at the time Marsy's Law was approved simply because the voters granted crime victims a right to a 'prompt and final conclusion' of criminal cases." ' " (*People v. Lombardo* (2020) 54 Cal.App.5th 553, 563.) We agree with these cases that the right to prompt and final conclusion of criminal cases and subsequent postjudgment proceedings does not prohibit

15

the Legislature from creating new postjudgment proceedings, and the Office does not explain how its writ petition seeks to vindicate that right in any other way. Accordingly, we conclude that article I, section 28, subdivision (b)(9) does not authorize the Office to bring its petition.

The Office points us to no other right enumerated in subdivision (b) of Marsy's Law that supports its standing to petition for writ of mandate here.[4] To the extent it relies on the Legislature's findings and declarations expressed in article I, section 28, subdivision (a), we reject those arguments because subdivision (a) articulates findings and declarations, "not an independent source of enforceable rights." (*People v. Lombardo*, *supra*, 54 Cal.App.5th at p. 563.)

Disagreeing with our conclusion, the Office observes that Marsy's Law authorized the San Diego District Attorney to petition for writ of mandate on behalf of the People in *Santos v. Brown* (2015) 238 Cal.App.4th 398. But in *Santos*, crime victims, the parents of a crime victim, and the San Diego County District Attorney filed suit alleging that a clemency decision by the Governor violated article I, section 28, subdivision (b)(8), which requires that victims have the opportunity to be heard at any postconviction release proceeding. (*Santos*, at pp. 404, 423.) Unlike *Santos* and as we have discussed, here the Office has identified no right enumerated by Marsy's Law that its petition seeks to vindicate.

The Office also contends the provision authorizing the prosecuting attorney to enforce the rights enumerated in Marsy's Law upon the request of the victim "has special equitable significance" because, in a case such as this involving the Board, "[t]he weight

---

[4] The trial court pointed to victims' right to "participate in the parole process." (Art. I, § 28, subd. (b)(15).) The Office does not raise that argument on appeal. Nevertheless, we observe that Senate Bill No. 394 does not restrict victims' right to participate in the parole process in any way.

16

of government tends naturally to tilt the scales of justice in favor of the party whom the government sponsors." (*Safer*, *supra*, 15 Cal.3d at p. 238.)  In addition to the obvious deficiency of this argument--as we have discussed, the Office is not enforcing a right enumerated in subdivision (b) of Marsy's Law--the Office's argument misapprehends *Safer*.  To explain, we discuss *Safer* in detail.

In *Safer*, a farmworkers' union began picketing fields of several growers.  The growers filed a complaint seeking injunctive relief and damages, and they obtained a temporary restraining order limiting the spacing and number of pickets.  The next day several farm workers were arrested and charged with willful disobedience of the court order.  The defendants pleaded not guilty and requested a jury trial.  However, on the day set for trial, the district attorney--who was not a party to the civil action in which the injunction had issued--served the defendants with orders to show cause in civil contempt proceedings and procured dismissal of the criminal charges.  The result was "to convert a misdemeanor proceeding, in which defendants had the protection of a jury trial and other statutory safeguards, into a contempt proceeding, in which defendants would be stripped of these protections." (*Safer*, *supra*, 15 Cal.3d at p. 234.)  The trial court overruled the defendants' demurrer and denied their request for a jury trial on the civil charges.

The defendants sought a writ of prohibition in our Supreme Court, which issued the writ.  As we have discussed, the court observed that "the Legislature has manifested its concern that the district attorney exercise the power of his office only in such civil litigation as that lawmaking body has, after careful consideration, found essential.  An examination of the types of civil litigation in which the Legislature has countenanced the district attorney's participation reveals both the specificity and the narrow perimeters of these authorizations." (*Safer*, *supra*, 15 Cal.3d at p. 236.)  After describing statutes empowering a district attorney to bring a civil action, which we set forth *ante*, the court observed that none of those statutes authorized a district attorney "to intervene at will in a civil case involving private parties in an economic dispute" (*ibid.*), despite "the

17

Legislature's clear demonstration that it knows how to grant [the district attorney] such power when it wishes to do so" (*id.* at pp. 237-238). The court observed that "our legal system has long depended upon the self-interested actions of parties to pursue a dispute to its conclusion, or to decide, alternatively, that further time-consuming litigation serves no one's best interests." (*Id.* at p. 238.) Accordingly, the district attorney's intrusion into a dispute between two private parties "serves neither the public interest nor the statutory intent." (*Ibid.*) Indeed, "the introduction of the government itself on one side of the litigation" "tend[ed] naturally to tilt the scales of justice in favor of the party whom the government sponsors." (*Ibid.*) The court further noted that in that case, "the intrusion of the district attorney exposes the disadvantaged litigant to a special danger; the district attorney undertakes to bring about nothing less than his incarceration." (*Ibid.*)

The Office argues *Safer* supports its argument that introducing itself into litigation between a private party and a state agency "balances the scales of equity." However, the inequities noted in *Safer* are not at issue here. *Safer* does not provide that fairness demands a private party suing to enjoin a government agency from enforcing a legislative enactment must be permitted to have another government agency represent it. Nor does *Safer* provide that a district attorney may act on behalf of a private party without statutory or constitutional authority where the private party is litigating against a government entity. Indeed, quite the opposite is true. *Safer* stands for the proposition that a district attorney may not engage in civil litigation absent statutory or constitutional authority. (*Safer*, *supra*, 15 Cal.3d at pp. 236-238.) *Safer* does not support the Office's argument.

Based on the foregoing, we conclude Marsy's Law does not provide standing for the Office to petition for a writ of mandate in this case.

E. *Auxiliary Authority*

The Office raises a litany of arguments as to why it has standing to petition for writ of mandate in the absence of express statutory or constitutional authority to do so. We address the arguments in turn.

18

It first asserts that Lombardi is "clearly beneficially interested in this case" as the spokesperson for the Ingebretsen family. However, it does not explain the relevance of this assertion. Although it includes this assertion under a section headed: "Writ Law: Respondents Are Beneficially Interested," and cites article I, section 28, subdivisions (a)(3) and (c)(1) in that section, we have rejected its argument regarding the applicability of Marsy's Law *ante*.

Next, the Office relies on *Bravo v. Cabell* (1974) 11 Cal.3d 834 (*Bravo*) for the proposition that its writ petition "relates to and arises out of a criminal action," and therefore "it must be regarded as part of such criminal action." (*Id.* at p. 838.) In *Bravo*, one criminal defendant attempted to file a petition for writ of mandate, and another attempted to file a return to an alternative writ, in the superior court arising out of their motions in the municipal court to obtain pretrial discovery. Both defendants attempted to file without paying the filing fee. The superior court clerk refused to file either document without payment of the filing fee, and both defendants petitioned for writ of mandate in our Supreme Court. The court agreed with the defendants that the filing fee requirement did not apply to them because the documents they submitted for filing arose out of a criminal action, concluding that "where a proceeding for a prerogative writ arises from a pending criminal prosecution in the municipal court, . . . the proceeding [is] so integrally connected with the criminal action that the county clerk must apply the statutory exemption for fees 'in any criminal action.' " (*Ibid.*)

In reaching that conclusion, the *Bravo* court "discern[ed] no significant difference between a review of a criminal proceeding by an appeal from a judgment of conviction and a review of part of the same criminal proceeding by prerogative writ to justify the conclusion that while the former process of review retains the criminal character of the proceeding below, the latter process is in some mysterious way substantially, if not entirely, metamorphosed." (*Bravo*, *supra*, 11 Cal.3d at p. 839.) The court recognized that a writ proceeding arising from a criminal action had features inherently similar to an

19

appeal from a judgment of conviction: "Both methods of review are limited to issues involved in the criminal action and they have a common objective of correcting or preventing error, as the case may be, on the part of the trial court in the underlying action." (*Ibid.*) For example, a criminal defendant may initiate a writ proceeding to protect his right to a fair trial by seeking a change of venue, by asserting his right to a speedy trial, by urging substitution of appointed counsel, or in connection with pretrial discovery orders. (*Id.* at pp. 839-840.) "Such writ proceedings initiate no new controversy but relate only to the action below. They are made necessary by events in the criminal action and . . . are ' "a part of the proceedings in the case to which it refers" rather than as "a new adversary suit." ' " (*Id.* at p. 840.) Similarly, in *People v. Paiva* (1948) 31 Cal.2d 503, at page 509, our Supreme Court concluded that a writ of error coram nobis is "properly regarded 'as a part of the proceedings in the case to which it refers' rather than as 'a new adversary suit' " for purposes of determining whether a criminal defendant was exempt from paying civil filing fees for the writ action.

At oral argument, the Office observed that Ramazzini's case is not yet final because his juvenile transfer hearing is pending. (See *People v. Ramazzini*, *supra*, C088503.) However, even if the judgment in Ramazzini's criminal case is not yet final, *Bravo* does not assist the Office because, unlike *Bravo*, we discern significant differences between an appeal from the underlying judgment and the writ proceeding here. First, the nature of this writ proceeding is not limited to issues involved in the underlying criminal action. The Office's objective is not to correct or prevent error on the part of the trial court, but rather to enjoin a governmental agency from enforcing the provisions of a legislative enactment based on the assertion that the legislation was illegally enacted. Thus, the instant writ proceeding is significantly different from the types of writs that *do* arise out of criminal cases as described in *Bravo*: those to change venue, assert the defendant's right to speedy trial, urge substitution of appointed counsel, or challenge pretrial discovery orders. (*Bravo*, *supra*, 11 Cal.3d at pp. 839-840.) Second, unlike those

20

writs, which closely relate to the underlying criminal proceeding, the nature of the current proceeding is a new controversy between the Office and the Board, which involves Ramazzini only indirectly, and does not involve any issue related to his underlying criminal case. Accordingly, we disagree that the Office has authority to pursue its writ petition because the petition "arises out of an underlying criminal case." It does not.

The Office's third argument is unclear to us; it first asserts (correctly) that district attorneys have a recognized substantial interest in postjudgment modifications of criminal sentences. (*People v. Montellano* (2019) 39 Cal.App.5th 148, 156-157; *People v. Superior Court (Kaulick)* (2013) 215 Cal.App.4th 1279, 1294-1295.) It then observes that section 1238 empowers district attorneys to appeal from an order affecting "the substantial rights of the people" (*id.*, subd. (a)(5)), an order "modifying the verdict or finding by reducing the degree of the offense or the punishment imposed or modifying the offense to a lesser offense" (*id.*, subd. (a)(6)), and "[t]he imposition of an unlawful sentence" (*id.*, subd. (a)(10)). It then acknowledges that there is no order here from which to appeal, but contends Ramazzini's sentence was modified to unlawfully reduce his punishment. Finally, it concludes from these points that it is "beneficially interested" in the issue and thus has standing to pursue its writ petition under Code of Civil Procedure section 1086.

To the extent we understand this argument, we conclude it lacks merit. At the outset, as the Office acknowledges, there is no order or judgment from which it can appeal, and it does not assert that the sentence imposed by the trial court--as opposed to the sentence as affected by a subsequent legislative enactment--was unlawful; therefore, section 1238 does not authorize it to bring suit here.

The Office also appears to contend it is beneficially interested (such that it has standing pursuant to Code of Civil Procedure section 1086) because district attorneys have a recognized substantial interest in postjudgment modifications of criminal sentences. But the Office's interest in postjudgment modifications of criminal sentences

21

does not authorize it to represent the People in the absence of statutory or constitutional authority in any action in civil law or equity that may be of legitimate interest the People. If the Office's authority were to be read so broadly, the general limitations noted in *Safer*, *supra*, 15 Cal.3d at page 236 and related cases would be meaningless.

The Office next argues that civil actions by a district attorney are proper if "though civil in nature, [they are] closely related to and in furtherance of criminal law enforcement" (*Rauber*, *supra*, 229 Cal.App.3d at p. 948), and that it can participate in "civil matters that are in aid of or auxiliary to" its normal duties (*People v. Parmar* (2001) 86 Cal.App.4th 781, 807).  It further asserts that an action with a "public, penal objective" is "fundamentally a law enforcement action."  (*Abbott Laboratories v. Superior Court* (2018) 24 Cal.App.5th 1, 22, revd. & remanded *sub nom. Abbott Laboratories*, *supra*, 9 Cal.5th 642.)  As we will explain, these cases are inapposite.

In *Rauber*, *supra*, 229 Cal.App.3d 942, government aid recipients challenged the district attorney's representation of the county, where the county had also appointed county counsel, in hearings regarding the county's determination that the recipients had received overpayments.  The appellate court recognized that "certain functions not amounting to the prosecution of a criminal offense may nevertheless fall within the ambit of the district attorney's prosecutorial role, and therefore may be performed by the district attorney even where there is a county counsel." (*Id.* at p. 948.)  The court cited as an example the district attorney's responsibility to bring civil red-light abatement actions, which were compatible with his duties as public prosecutor.  (*Ibid.*)  Thus, the court observed that " '[i]t is . . . clear that the district attorney's duties as public prosecutor embrace more functions than the prosecution of criminal actions.'  [Citation]  If such functions, though civil in nature, are closely related to and in furtherance of criminal law enforcement, then the district attorney may properly perform them."  (*Ibid.*)

In deciding that the fair hearing was " 'in aid of or auxiliary to the enforcement of the criminal law,' " the *Rauber* court observed that, if the district attorney were barred

22

from participating in the hearing, he or she would then be collaterally estopped from relitigating issues raised at the hearing in a criminal proceeding. (*Rauber*, *supra*, 229 Cal.App.3d at p. 951.) The court further recognized that "because issues and evidence involved in the [fair hearing] may be identical or closely similar to those in prospective criminal proceedings, the district attorney's handling of both matters avoids duplication of time and expense. The district attorney's participation at the [fair hearing] may also obviate the need for subsequent criminal proceedings, thereby making efficient use of governmental resources." (*Id.* at pp. 951-952.) Moreover, the court noted that the district attorney at the hearing was "not acting as a public officer bringing an action in the name of the people, but as an attorney with no greater powers than any other attorney representing his or her client at an administrative hearing." (*Id.* at p. 952.)

In *People v. Parmar*, *supra*, 86 Cal.App.4th at page 798, this court recognized that "some functions, though civil in nature, are so closely related and in the furtherance of criminal law enforcement that the district attorney may properly perform them." In that case, the criminal defendants had argued that a district attorney should be disqualified because a local redevelopment agency paid for part of the district attorney's salary for purposes of prosecuting civil nuisance abatement actions. The district attorney had been involved in various noncriminal matters related to the defendants' conduct, which the defendants argued created a conflict. Disagreeing, we recognized that a district attorney's interests are not limited to the prosecution of crime, and their discretion is greatest before charges are filed. (*Id.* at p. 806.) Thus, the district attorney's efforts to achieve resolution of issues without criminal or civil litigation demonstrated the exercise of their prosecutorial discretion. (*Id.* at p. 807.) This court rejected the trial court's view that a conflict of interest arises where a district attorney participates in what are normally considered civil matters; notably, the district attorney *retained civil statutory duties of nuisance abatement*. (*Ibid.*) Citing *Rauber*, we concluded that the district attorney may participate in "civil matters that are in aid of or auxiliary to" their usual duties. (*Ibid.*)

23

In *Abbott Laboratories v. Superior Court*, *supra*, 24 Cal.App.5th at page 22, the appellate court concluded that Business and Professions Code section 17206 authorized the district attorney to bring an action for civil penalties in the name of the People. The court recognized: "An action seeking injunctive relief and civil penalties filed by a public prosecutor on behalf of the People is not primarily concerned with restoring property or benefitting private parties; it is fundamentally a law enforcement action with a public, penal objective," and an action filed by the People is " 'designed to penalize a defendant for past unlawful conduct and thereby deter future violations.' " (*Abbott Laboratories*, at p. 22.)

*Parmar*, *Rauber*, and *Abbott Laboratories v. Superior Court*, *supra*, 24 Cal.App.5th 1 are each distinguishable from the facts here. In *Parmar* and *Abbott Laboratories*, the district attorney acted pursuant to express statutory authorization. As we have discussed, the Office has no express statutory authorization here.

Similarly, unlike *Parmar*, in which the district attorney exercised prosecutorial discretion to resolve issues without litigation, here the Office's petition is not related to its exercise of prosecutorial discretion prior to a charging decision, but rather is an attempt to invalidate Senate Bill No. 394. Nor is this case like *Rauber* or *Abbott Laboratories v. Superior Court*, *supra*, 24 Cal.App.5th 1, which recognized that the district attorney may prosecute certain non-criminal actions that are compatible with his role as public prosecutor. (*Rauber*, *supra*, 229 Cal.App.3d at p. 948; *Abbott Laboratories*, at p. 22.) The Office's petition is not like a civil red-light abatement action, which, while a civil proceeding, is similar to a criminal prosecution. Instead, here the Office is seeking to enjoin a state agency from enforcing a legislative enactment through a court order declaring the enactment unconstitutional, which is distinctly unlike a criminal prosecution. The court in *Rauber* further recognized that the civil hearing was "in aid of or auxiliary to the enforcement of the criminal law" because the district attorney in that case would be estopped from relitigating issues raised at the hearing in a

24

later criminal proceeding, and because issues raised and evidence produced at the hearing may be identical or closely related to those in prospective criminal proceedings. (*Rauber*, at pp. 951-952.) Unlike *Rauber*, here there are no estoppel issues, and there is no evidence that could be used in future criminal prosecutions.

As the Board notes, the Ninth Circuit Court of Appeals recently rejected an argument similar to the one advanced by the Office here. In *Cooper v. Newsom* (9th Cir. 2021) 13 F.4th 857, an inmate brought a constitutional challenge to the State's execution protocol. While the suit was pending, the Governor withdrew the challenged protocol, placed a moratorium on the death penalty, and closed the execution chamber at San Quentin. Several district attorneys moved to intervene, contending they should be allowed to represent the State and argue the death sentence should be enforced. (*Id.* at p. 865.) They argued they have a state law duty to prosecute criminal cases, and sole discretion to determine whom to charge, what charges to file, and what punishment to seek. (*Ibid.*)

The federal appellate court concluded the district attorneys failed to show they have a significant protectable interest in the litigation such that they should be allowed to intervene. (*Cooper v. Newsom*, *supra*, 13 F.4th at p. 865.) The court observed that district attorneys may only participate in civil litigation to the extent the Legislature has specifically authorized. (*Id.* at p. 866, citing *Safer*, *supra*, 15 Cal.3d 230 [district attorney may only exercise the power of his office in such civil litigation as the Legislature has found essential]; *People v. Superior Court (Humberto S.), supra,* 43 Cal.4th at p. 753 ["[A] district attorney has no authority to prosecute civil actions absent specific legislative authorization"]; Gov. Code, §§ 26500-26530 [detailing office of District Attorneys].) Because the district attorneys lacked any identifiable authorization to represent the state's interest in that case, they were not permitted to intervene. (*Id.* at pp. 866, 868.)

The Board also points to the trial court's recent decision in *Schubert v. State of California, Department of Corrections and Rehabilitation* (Super. Ct. Sacramento County, 2022, No. 34-2021-00312867), in which 28 district attorneys challenged a Department of Corrections and Rehabilitation (CDCR) regulation amending how certain prison inmates earned good conduct credit.[5] The district attorneys argued that CDCR's regulation was promulgated in violation of the Administrative Procedures Act. The trial court concluded the district attorneys lacked standing; it rejected the district attorneys' argument they had standing because they are empowered to prosecute criminal offenses, they represent victims and their next of kin, and they represent Californians who have been affected by the regulations. Relying on *Safer*, the court concluded that Government Code section 11350, subdivision (a), which authorizes "interested person[s]" to obtain a judicial declaration as to the validity of any regulation, did not provide standing because that statute does not expressly authorize district attorneys to bring such a civil action. The court recognized that if the district attorneys' authority were read as broadly as they had contended, the limitations noted in *Safer* would be meaningless. We recently granted the district attorneys' request for dismissal of their appeal from the trial court's ruling. (*Schubert et al. v. Department of Corrections and Rehabilitation et al.* (C095588, app. dism.).)

---

[5] The Attorney General requests we take judicial notice of the minute order denying the motion for preliminary injunction by 28 district attorneys appearing on behalf of the People in *Schubert v. California Department of Corrections and Rehabilitation, supra,* No. 34-2021-00312867, as well as the first amended petition for writ of mandate and/or prohibition and complaint for injunctive relief filed in *Peterson v. Bd. of Parole Hearings* (Super. Ct. Sacramento County, 2022, No. 34-2022-80003792) and the People's letter brief filed in *People v. Lozano* (B278663). The Office does not object to the request. We will grant the request and take judicial notice of those court records. (Evid. Code, §§ 459, subd. (a) ["The reviewing court may take judicial notice of any matter specified in [§] 452"], 452, subd. (d) [permitting a court to take judicial notice of records of "any court of this state"].)

Finally, the Office argues that it has greater powers regarding parole for those people sentenced to life in prison, including the right to represent the interests of the People (§ 3041.7) and the views of the victim and the victim's family at parole hearings (§ 3043.2, subd. (c).) But the Office's role in parole hearings is irrelevant to the question of whether it has standing to petition for writ of mandate to invalidate a legislative enactment. The fact that the district attorney could object to the constitutionality of a statute at a parole hearing does not also mean the Office may petition for writ of mandate to invalidate the statute. As we have discussed, to expand the authority of the Office as broadly as it urges would vitiate *Safer*.

Based on the foregoing, we conclude the Office lacks authority to petition for writ of mandate to invalidate Senate Bill No. 394 as it applies to Ramazzini. The various cases the Office relies upon are inapposite and do not authorize it to petition for writ of mandate in the absence of statutory or constitutional authorization.

F. *Fairness and Equity*

The Office argues that equity demands that its writ proceed because a writ "*should* not be denied when 'the issues presented are of great public importance and must be resolved promptly.' " (*Corbett v. Superior Court* (2002) 101 Cal.App.4th 649, 657.) But accepting the Office's argument would require us to conclude that it may participate in a civil proceeding absent the requisite statutory or constitutional authority any time it believes that a legislative enactment is unconstitutional. We decline to vitiate *Safer* and its progeny by so concluding.

Further, our decision here does not signal that Senate Bill No. 394 is beyond challenge. Without opining on the merits of litigation not before us, we observe that Senate Bill No. 394 is currently being challenged in a separate proceeding brought by a crime victim, who is represented by a civil rights law firm, pursuant to Code of Civil Procedure sections 1085 and 1103. (See *Peterson v. Bd. of Parole Hearings*, *supra*, No. 34-2022-80003792.) Additionally, as the trial court observed at the hearing on the

27

petition, district attorneys *may* be able to challenge the constitutionality of Senate Bill No. 394 in the context of *pending* criminal cases.  We have no cause to opine on the trial court's observation beyond the circumstances presented in this appeal, except to recognize the Office has not established that the issues raised in its petition are of such great public importance that they must be resolved in the absence of statutory or constitutional authority allowing it to bring such a petition.[6]

## DISPOSITION

The judgment is reversed, and the matter is remanded to the trial court with directions to dismiss the action.  Costs are awarded to the appellants.  (Cal. Rules of Court, rule 8.278(a).)


_____/s/_____
Duarte, J.


We concur:


_____/s/_____
Robie, Acting P. J.


_____/s/_____
Krause, J.

_____

[6] Because we conclude the Office lacks authority to petition for writ of mandate, we do not consider whether principles of judicial estoppel bar its petition, and we do not reach the merits of the Board's or Ramazzini's substantive claims regarding the constitutionality of Senate Bill No. 394.